IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CR-481-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| BRENT BREWBAKER and CONTECH | ) | |
| ENGINEERED SOLUTIONS LLC, | ) | |
| | ) | |
| Defendants. | | |

This matter is before the court on motion of defendant Contech Engineered Solutions LLC ("Contech") to have the court apply the "Rule of Reason" in this case. (DE 35).[1] The issues raised have been briefed fully, and in this posture are ripe for ruling. For the following reasons, the motion is denied.

## STATEMENT OF THE CASE

Indictment returned October 21, 2020, charges defendants with one count of conspiracy to rig bids in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (the "Sherman Act count"), one count of conspiracy to commit mail and wire fraud, three counts of mail fraud, and one count of wire fraud.

On December 4, 2020, defendant Contech filed the instant motion seeking the court to apply a "rule of reason" legal standard to the Sherman Act count. Defendant Contech relies upon an affidavit by Kenneth G. Elzinga ("Elzinga"), a professor of economics at the University of Virginia; declarations by defendant Brewbaker and Douglas A. Witten, who is also an employee

---

[1] Defendant Brent Brewbaker ("Brewbaker"), an employee of defendant Contech, responded in support of defendant Contech's motion. (Def. Brewbaker's Resp. Supp. (DE 49)).

of defendant Contech; and examples of the bids allegedly underlying the instant charges. Extensive briefing followed. Defendant Contech's motion, joined in by defendant Brewbaker, is vigorously opposed by the government.[2]

<h2 style="text-align:center">STATEMENT OF THE FACTS</h2>

The facts alleged in the indictment are as follows. The North Carolina Department of Transportation ("NCDOT") solicits bids for various infrastructure projects including, as relevant here, completion of civil engineering projects related to the flow of water around highways and roads. These projects can be completed using aluminum structures, for which defendant Contech, an Ohio corporation, is in the business of manufacturing aluminum pieces. Defendant Brewbaker, during the time period relevant to this case, was a North Carolina-based employee of Contech responsible for preparing and submitting defendant Contech's bids for NCDOT projects. Relevant, too, is unindicted Company A, which designs aluminum structures and provides installation services. Company A purchases aluminum pieces from defendant Contech and uses these pieces to complete projects for NCDOT, serving as defendant Contech's distributor.

Company A and defendant Contech both regularly participated in the bidding process for NCDOT projects. Defendant Contech would solicit Company A's bid price prior to submitting its own bid, a process orchestrated by defendant Brewbaker, and then use this information to submit bids priced higher than Company A's to NCDOT. For example, the indictment alleges that while initially defendant Brewbaker called Company A "directly to obtain Company A's bid prices for aluminum structure projects prior to" submitting defendant Contech's bids, he eventually directed an unindicted Contech employee to solicit this information by email, in-person, and by phone.

---

[2] A joint status report is due from the parties on March 31, 2021, in response to the court's March 1, 2021, order regarding defendant's motion to compel. Issues raised in that report for the court's consideration will be addressed in a separate order entered after such report is filed.

2

(Indictment (DE 1) ¶ 16). Company A would provide this information, but it did not solicit defendant Contech's price in return because the understanding was that defendant Contech would always bid higher than Company A's bid price. Actual bids submitted by defendant Contech and Company A were accompanied by certifications that stated the companies' bids were submitted competitively and without collusion.

Further relevant facts raised by the parties will be discussed in the analysis herein.

## DISCUSSION

A.    Standard of Review

Rule 12 of the Federal Rules of Criminal Procedure allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1); see also United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986) ("A pretrial motion is generally 'capable of determination' before trial if it involves questions of law rather than fact."). Rule 12 also requires certain types of "defenses, objections, and requests" to "be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits," including "a defect in the indictment or information." Fed. R. Crim. P. 12(b)(3)(B). One such infirmity is "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).

Rule 12(b)(1) motions are governed by Rule 47, which allows for the moving party to "serve any supporting affidavit with the motion." Fed. R. Crim. P. 12(b)(1); Fed. R. Crim. P. 47(d). In contrast, motions challenging "the sufficiency of the indictment . . . [are] ordinarily limited to the allegations contained in the indictment." United States v. Engle, 676 F.3d 405, 415 (4th Cir. 2012). While "there is no provision for summary judgment in the Federal Rules of Criminal Procedure," this does not prevent a district court from "consider[ing] a pretrial motion to dismiss

3

an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." United States v. Weaver, 659 F.3d 353, 355 n.* (4th Cir. 2011); see also United States v. Sampson, 898 F.3d 270, 279 (2d Cir. 2018) ("Conspicuously absent from the Federal Rules of Criminal Procedure, however, is an analogue for summary judgment under Federal Rule of Civil Procedure 56.").

Here, the proper procedural vehicle for the instant type of motion is unclear, where the defendant seeks not to dismiss the indictment but rather seeks to have the applicable law decided in advance of trial. Defendant Contech's motion specifically cites Federal Rule of Criminal Procedure 12(b)(1) as the operative rule. The government contends in opposition that the instant motion should be construed as a motion to constructively amend or dismiss a charge in the indictment because the indictment alleges that the conspiracy engaged in by defendants and their co-conspirators was a "per se unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of the Sherman Antitrust Act." (Government's Resp. Opp'n (DE 47) 7 (quoting Indictment (DE 1) ¶ 22)). Further, the parties represent that the Antitrust Division of the U.S. Department of Justice does not typically pursue criminal antitrust charges under a "rule of reason" legal theory and would not do so here. (Def. Contech's Memo. Supp. Mot. (DE 36) 23; Government's Resp. Opp'n (DE 47) 3).

The court's research does not reveal a clearly accepted or required procedural practice for bringing this type of motion. Courts have decided similar motions typically presented in the form of motions to dismiss indictments and to alternatively, or in addition, apply the "rule of reason." See, e.g., United States v. Kemp & Assocs., Inc., 907 F.3d 1264, 1272 (10th Cir. 2018) (considering appeal of "Rule of Reason Order" entered after the "defendants' motion for the case to be subject to the rule of reason" that was joined by a motion to dismiss the indictment on statute

of limitations grounds); <u>United States v. Suntar Roofing, Inc.</u>, 897 F.2d 469, 472 (10th Cir. 1990) (considering, on appeal after trial, "government's pre-trial motion to prevent the defendants from offering evidence of the reasonableness and/or economic justification for the alleged activities or evidence of the defendants' lack of intent to violate the law or to restrain trade"); <u>United States v. Hsuan Bin Chen</u>, No. CR 09-110 SI, 2011 WL 332713, at *3 (N.D. Cal. Jan. 29, 2011) (considering a motion to dismiss indictment that requested application of rule of reason, which would require an allegation of specific intent to produce anticompetitive effect that the indictment lacked), <u>aff'd sub nom.</u> <u>United States v. Hui Hsiung</u>, 778 F.3d 738, 744 (9th Cir. 2015); <u>United States v. Lischewski</u>, No. 18-CR-00203-EMC-1, 2019 WL 2251104, at *1 (N.D. Cal. May 24, 2019) (denying motion to dismiss indictment on duplicity grounds or apply rule of reason); <u>United States v. Usher</u>, No. 17 CR. 19(RMB), 2018 WL 2424555, at *2 (S.D.N.Y. May 4, 2018) (considering defendants' motion to dismiss indictment, which argued that the indictment failed to describe the conspirators as operating as competitors and that the per se rule was inapplicable, and concluding that "the indictment sets forth a per se violation of the Sherman Act").

However, even when faced with such motions to dismiss an indictment or apply the rule of reason, courts have typically restricted their review to the indictment. For example, in <u>United States v. Kemp & Associates, Inc.</u>, while the court ultimately decided to dismiss the government's appeal of a "Rule of Reason Order" due to lack of jurisdiction, it considered only the indictment's description of the conduct at issue and noted that "were the merits of the rule of reason order before [the court, it] might very well reach a different conclusion than did the district court," which had found the rule of reason applicable. <u>See</u> 907 F.3d at 1277; <u>see also</u> <u>United States v. Kemp & Assocs., Inc.</u>, No. 2:16CR403 DS, 2019 WL 763796, at *1 (D. Utah Feb. 21, 2019) (finding, on remand, the per se rule applicable in light of the Tenth Circuit's guidance).

5

Similarly, in United States v. Suntar Roofing, Inc., the panel, in considering the government's pretrial motion to exclude rule of reason evidence, reviewed the "activity alleged in the indictment." 897 F.2d at 473. The district court had "ruled that the indictment did in fact allege a per se violation of the Sherman Act, and that, assuming the government could present evidence establishing the violation charged in the indictment, the defendants would therefore be precluded from introducing evidence of reasonableness or justification at trial." Id. at 472-73. Subsequently, "[a]t trial, the court concluded that the government had established the violation charged and therefore precluded defendants' additional evidence." Id. at 473. The Tenth Circuit affirmed, holding that "the activity alleged in the indictment in this case . . . constitutes a per se violation of § 1 of the Sherman Act." Id. (emphasis added).

While the foregoing cases support restricting review to the indictment, the government's argument that allowance of the motion would effect a constructive amendment of the indictment is unavailing. The government has not pointed the court to any authority standing for the proposition that constructive amendment may be accomplished by a defendant. Rather, as typically understood, a "constructive amendment" or "fatal variance" occurs "[w]hen the government through its presentation of evidence or its argument, or the district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment." United States v. Malloy, 568 F.3d 166, 178 (4th Cir. 2009) (emphasis added).

While the answer is far from clear, the court finds treatment of defendant Contech's motion as a motion to dismiss the Sherman Act count for failure to state an offense pursuant to Rule 12(b)(3)(B)(v) to be the closest procedural analogue. Cf. United States v. Thomas, 367 F.3d 194, 197 (4th Cir. 2004) (noting "some uncertainty regarding the procedural posture of this claim" and treating motion to dismiss indictment instead "as a challenge to the adequacy of the factual basis

supporting [defendant's] plea"). The indictment charges a per se violation of the Sherman Act. (Indictment (DE 1) ¶ 22). Defendants contend that the conduct described by the indictment is not a per se unreasonable restraint of trade. Accordingly, the instant motion, in effect, argues that the indictment has failed to state an offense constituting a per se Sherman Act violation as the indictment purports to charge and, instead, charges an antitrust offense controlled by the "rule of reason." Cf., e.g., United States v. Milk Distribs. Ass'n, Inc., 200 F. Supp. 792, 795 (D. Md. 1961) ("The individual defendants moved to dismiss Count II as to them, on the grounds that their alleged participation in the conspiracy charged an offense punishable only under section 14 of the Clayton Act, while the indictment charged them only under section 1 of the Sherman Act."). This conclusion is not based on the government's representation that it does not prosecute antitrust cases involving allegations of violations of the Sherman Act analyzed under the "rule of reason," which is its due prerogative. The government's stated practice does not control the legal import of the instant motion.

Accordingly, considering only the indictment, the court reviews whether defendants have "demonstrate[d] that the allegations therein, even if true, would not state an offense." United States v. Thomas, 367 F.3d 194, 197 (4th Cir. 2004); see also United States v. Portsmouth Paving Corp., 694 F.2d 312, 317 (4th Cir. 1982) (explaining that "a necessary predicate to defining the essential elements of the crime" is noting that the "scheme alleged in the indictment is illegal per se under section 1 of the Sherman Act"); Dickson v. Microsoft Corp., 309 F.3d 193, 202 (4th Cir. 2002) (holding, in the civil context that "[t]o establish a violation of § 1 of the Sherman Act, [plaintiff] must prove the following elements: (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade"); United States v. Rubbish Removal, Inc., No. 3143, 1985 WL 1605, at *2 (N.D.N.Y. Apr. 11, 1985) ("The essential elements of a Sherman Act indictment are

7

the time, place, manner, means and effect of the alleged violation."). "To the extent an indictment relies on a 'general description based on the statutory language,' the indictment also should include 'a statement of the facts and circumstances as will inform the accused of the specific [offense], coming under the general description.'" United States v. Blankenship, 846 F.3d 663, 668 (4th Cir. 2017) (alteration in original) (quoting United States v. Perry, 757 F.3d 166, 171 (4th Cir. 2014)); United States v. Quinn, 359 F.3d 666, 673 (4th Cir. 2004) ("[T]he indictment must also contain a statement of the essential facts constituting the offense charged." (quotation omitted)). Finally, "[a] district court may dismiss an indictment under Rule 12 where there is an infirmity of law in the prosecution." Engle, 676 F.3d at 415 (quotation omitted).

With this standard in mind, defendants do not demonstrate that the indictment fails to allege a per se violation of the Sherman Act, as explained below. Therefore, their motion must be denied.

B.    Analysis

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The Supreme Court has interpreted this potentially expansive language to only "outlaw unreasonable restraints." State Oil Co. v. Khan, 522 U.S. 3, 10 (1997). "Restraints can be unreasonable in one of two ways." Ohio v. Am. Express Co., 138 S. Ct. 2274, 2283 (2018).

First, some practices are considered to, in and of themselves, unreasonably restrain trade and "are deemed unlawful per se" under § 1; the so-called per se rule. Leegin Creative Leather Prod., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007). This "small group of restraints are unreasonable per se because they 'always or almost always tend to restrict competition and decrease output.'" Am. Express Co., 138 S. Ct. at 2283 (quoting Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988)); N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958)

8

(explaining that certain practices are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use"). However, "the per se rule is appropriate only after courts have had considerable experience with the type of restraint at issue" in order to determine whether it has the requisite "manifestly anticompetitive effect[]." Leegin, 551 U.S. at 886 (quotation omitted); United States v. Topco, Inc., 405 U.S. 596, 607-08 (1972) ("It is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act." (emphasis added)).

Second, and in contrast, where the courts have not deemed a specific practice per se unlawful, it will be analyzed under the "rule of reason," under which a context-specific inquiry must be conducted to "distinguish[] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." Leegin, 551 U.S. at 885-86 (citing as exemplary, relevant factors "'specific information about the relevant business' and 'the restraint's history, nature, and effect'" (quoting Khan, 522 U.S. at 10)); see also Am. Express Co., 138 S. Ct. at 2284 (laying out "a three-step, burden-shifting framework" in the civil context). The rule of reason is presumptively applied, Leegin, 551 U.S. at 885-86, and the United States Supreme Court has explained that designation of a practice as per se unreasonable "must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing," Continental T. V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 58-59 (1977).

"Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'—qualify as unreasonable per se." Am. Express Co., 138 S. Ct. at 2283–84 (quoting Bus. Elecs., 485 U.S. at 730); see also Topco Assocs., 405 U.S. at 608 (explaining that horizontal arrangements are between "competitors at the same level of the market structure"). For example,

the Supreme Court has found that horizontal agreements among competitors to fix prices, Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006), and to divide markets, Palmer v. BRG of Ga., Inc., 498 U.S. 46, 49-50 (1990) (per curiam), are per se illegal. On the other hand "nearly every . . . vertical restraint," that is, a "restraint[] 'imposed by agreement between firms at different levels of distribution'. . . should be assessed under the rule of reason." Am. Express Co. 138 S. Ct. at 2284 (quoting Bus. Elecs., 485 U.S. at 730)); see also Topco Assocs., 405 U.S. at 608 ("[C]ombinations of persons at different levels of the market structure, e.g., manufacturers and distributors . . . are termed 'vertical' restraints.").

Moreover, the United States Court of Appeals for the Fourth Circuit, in accord with other federal circuit courts, has held that bid rigging is per se violative of the Sherman Act. Portsmouth Paving Corp., 694 F.2d at 317, 325; accord United States v. Fenzl, 670 F.3d 778, 780 (7th Cir. 2012) (describing bid rigging as "a form of price fixing in which bidders agree to eliminate competition among them, as by taking turns being the low bidder"); United States v. Bensinger Co., 430 F.2d 584, 589 (8th Cir. 1970) (holding bid rigging is "a price-fixing agreement of the simplest kind, and price-fixing agreements are per se violations of the Sherman Act"), abrogated on other grounds by Bourjaily v. United States, 483 U.S. 171 (1987); United States v. Koppers Co., 652 F.2d 290, 294 (2d Cir. 1981).

The Fourth Circuit has held unequivocally that "[a]ny agreement between competitors pursuant to which contract offers are to be submitted to or withheld from a third party constitutes bid rigging." Portsmouth, 694 F.2d at 325; see also id. at 325 n.18 ("[C]ollusive bidding is 'an agreement between competitors in a bidding contest to submit identical bids or, by preselecting the lowest bidder, to abstain from all bona fide effort to obtain the contract." (emphasis added) (quoting 1 Rudolf Callmann, The Law of Unfair Competition, Trademarks and Monopolies § 4.34,

at 203))).  To constitute bid rigging, there is no "requirement that coconspirators agree to reciprocate by submitting complementary bids on future projects." Id. at 625 (explaining that a definition of bid rigging that included such a requirement would be "an erroneous statement of the law").  "[W]here two or more persons agree that one will submit a bid for a project higher or lower than the others or that one will not submit a bid at all, then there has been an unreasonable restraint of trade which violates the Sherman Antitrust Act."  United States v. W.F. Brinkley & Son Const. Co., 783 F.2d 1157, 1161 (4th Cir. 1986) (describing this statement as an "accurate statement of the law"); see also Koppers, 652 F.2d at 295 (finding bid rigging where competitors acted in concert "to bid according to agreed-upon prices").

For example, in Portsmouth Paving Corp., the Fourth Circuit described an arrangement between paving companies "[t]o allocate . . . roadway construction and surface paving contracts" and "[t]o refrain from bidding or to submit collusive, non-competitive and rigged bids . . . in connection with . . . roadway construction and surface paving contracts" as an impermissible horizontal restraint in the form of bid rigging.  694 F.2d at 316 (first two alterations and omissions in original) (quoting indictment).  The  accused companies were able to "trade projects among themselves by agreeing to withhold bids or to submit artificially high 'complementary' bids on certain projects" in conjunction with the designated lowest bidder's bid, meaning that, in effect, the co-conspirators decided which conspirator would have the lowest, and therefore winning, bid. Id. at 316 & n.2.  The panel did "not hesitate to conclude" that the alleged arrangement was the type of per se illegal agreement between competitors condemned by the Sherman Act. Id. at 317-18.

Similarly, in United States v. W.F. Brinkley & Son Construction Co., the Fourth Circuit considered an agreement between companies regarding a contract to complete water infrastructure

11

projects for Elizabeth City, North Carolina. 783 F.2d 1157, 1158 (4th Cir. 1986). In that case, after an initial round of bidding by three companies that did not result in the grant of the contract due to the unexpectedly high bid prices, two of the defendants agreed prior to the next round of bidding that one "would intentionally submit a high or 'complementary' bid to ensure that [the other] would again be the low bidder" and that the winner would subcontract certain work to the losing company. Id. at 1159. A third company, who had originally intended to submit a competitive bid, also solicited from the lowest bidder "a 'safe' number" to bid, after deciding to submit a non-competitive bid." Id. The court concluded that "[i]t [was] clear that [defendants'] conduct constituted bid rigging in violation of the antitrust laws." Id. at 1160.

Here, the indictment alleges facts permitting an inference that defendant Contech, by and through its agent defendant Brewbaker, engaged in an "agreement between competitors pursuant to which contract offers [were] . . . submitted to . . . a third party," that is, bid rigging under the foregoing Fourth Circuit precedent. When defendant "Brewbaker called Company A directly to obtain Company A's bid prices for aluminum structure projects prior to submitting a bid on behalf of [d]efendant Contech," and "Company A['s] representatives . . . understood that [d]efendant Contech . . . would submit rigged bids that were intentionally higher than those submitted by Company A" based on the two companies' communications, an agreement cognizable under Section 1 of the Sherman Act as bid rigging had been formed. See Brinkley, 783 F.2d at 1160 ("[W]hen [the co-conspirator] contacted [defendant] requesting a safe number to bid and he consented to give them one . . . , [a]t that point, there was an agreement between two competitors pursuant to which bids would be submitted to Elizabeth City . . . [and s]uch an agreement is clearly bid rigging."). There is no dispute that the bid offers by defendant Contech and Company A to complete the NCDOT projects were contract offers. Although defendants vigorously contest that

12

defendant Contech acted as a competitor to Company A in this context, the court concludes that, in submitting bids for the same project, Company A and defendant Contech acted as facially competing for award of the project, for which they would have been competing except for the alleged illegal agreement between the two. Accordingly, all the elements of the Fourth Circuit's definition of bid rigging have been alleged: Contech formed an agreement with its fellow bid competitor Company A, pursuant to which bids to complete infrastructure projects, contract offers, were submitted to a third-party, NCDOT.

The fact that this was done as to "not undercut its dealer's price," (Def. Contech's Memo. Supp. Mot. (DE 36) 4), or that it had beneficial economic benefits (see generally Elzinga Aff. (DE 37-1)), is inapposite under the applicable law. Although the conduct may allegedly be procompetitive, there is no need to look at economic impact as described in the Elzinga affidavit because where a practice is per se illegal, like bid rigging is, "further inquiry on the issues of intent or the anti-competitive effect is not required." Brinkley, 783 F.2d at 1162. That Elzinga does not consider the practice bid rigging economically is not relevant because, in his own words, he is "not an attorney and []his affidavit offers no conclusions about antitrust law." (Elzinga Aff. (DE 37-1) 6).

Defendant Contech urges that because bid rigging does not, it argues, typically involve manufacturer's additional bids, "the Court must apply the economics mandated by Leegin and provided by [Elzinga]." (Def. Contech's Reply (DE 53) 5). However, "the machinery employed by a combination for price-fixing is immaterial," Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 647 (1980), and, as already noted, a "bid rigging agreement is [a] price-fixing agreement of the simplest kind." Portsmouth Paving Corp, 694 F.2d at 318 (quotation omitted); see also Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 351 (1982) ("[T]he argument that the per se rule

13

must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for per se rules . . . .").  That defendants and their co-conspirators were not able to perfectly fix the price NCDOT would have to pay because an unindicted third company[3] also placed bids does not answer whether the alleged conspirators agreed to a bid rigging or price fixing agreement.  See United States v. Socony–Vacuum Oil Co., 310 U.S. 150, 224 n.59 ("It is the 'contract, combination . . . or conspiracy, in restraint of trade or commerce' which § 1 of the Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other." (omission in original) (quoting United States v. Trenton Potteries Co., 273 U.S. 392, 402 (1927))); see also United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 90 (2d Cir. 1999) ("[A] conspiracy warranting conviction can exist even if, for sentencing purposes, it does not succeed in affecting prices throughout the entire period of the conspiracy, or at all."); United States v. Hayter Oil Co. of Greeneville, Tenn., 51 F.3d 1265, 1274 (6th Cir. 1995) (noting that "price-fixing" is  "illegal per se, without regard to its success, merely because of its plainly anticompetitive effect" (emphasis added)).  As defined by relevant and binding Fourth Circuit precedent, defendants are alleged to have engaged in a bid-rigging agreement, which is per se an unreasonable restraint of trade and therefore violative of Section One of the Sherman Act, obviating the applicability of the rule of reason.

Defendants advance two additional arguments against the application of the per se rule to the alleged scheme.  First, defendants argue that since bid rotation is not at issue in this case, the per se prohibition on bid rigging is not implicated here.  Second, the defendants argue that the

---

[3]   Defendant Contech contends that the government has attempted to "writ[e] an indictment that skillfully sweeps [the third unindicted company] under the rug in its description of the market." (Def. Contech's Reply (DE 53) 7).  However, the indictment alleges that "[d]uring the conspiracy period, [d]efendant Contech Engineered Solutions LLC, Company A, and others submitted bids for NCDOT aluminum structure projects," indicating that Company A and defendant Contech were not the sole market participants. (Indictment (DE 1) ¶ 8).

relationship between defendant Contech and Company A was vertical in nature, implicating the Supreme Court's guidance that such arrangements are presumptively governed by the rule of reason. The court addresses each argument in turn below.

1. Whether the Underlying Conduct Constitutes Bid Rigging

Defendants argue that because, in their view, bid rigging is "typically a bid-rotation scheme designed to trade off the lowest bid on one project in return for a reciprocal trade-off on another bid," (Def. Contech's Memo. Supp. Mot. (DE 36) 3), the clear prohibition on bid rigging is not implicated here, further citing United States v. Herrernan for the proposition that "the vast majority of cases in which the term [bid rigging] has appeared have treated it as a synonym for bid rotation." 43 F.3d 1144, 1146 (7th Cir. 1994).[4]

Portsmouth forecloses this argument. The court unequivocally stated that requiring a definition of bid rigging to include an element "that coconspirators agree to reciprocate by submitting complementary bids on future projects" would be erroneous. Portsmouth, 694 F.2d at 325. Instead, the court explained that "[a]ny agreement between competitors pursuant to which contract offers are to be submitted to or withheld from a third party constitutes bid rigging per se

---

[4] The Heffernan court considered the meaning of the United States Sentencing Guideline on antitrust violations, which imposes a one level offense enhancement for defendants "whose offense involves the submission of 'noncompetitive bids.'" 43 F.3d at 1145 (quoting U.S.S.G. § 2R1.1(b)(1)). However, although finding that "interpreting 'bid rigging' (equivalently 'noncompetitive bids') . . . as meaning bid rotation" to be the correct result, the court admitted that the interpretation was its "best guess as to the meaning of the antitrust guideline" because "its treatment of bidding is a muddle," while also recognizing that the guideline's reference to "'a bid-rigging case in which the organization submitted one or more complementary bids' impl[ies] that some bid rigging does not or at least need not involve bid rotation." Id. at 1148, 1150 (quoting U.S.S.G. 2R1.1(d)(3)). Further, in considering the same issue, the Fourth Circuit came to a different conclusion that Heffernan, stating that it was "not persuaded that § 2R1.1(b)(1) . . . is limited to bid-rotation cases." United States v. Romer, 148 F.3d 359, 371 (4th Cir. 1998) (acknowledging and explicitly declining to reach the same conclusion as Heffernan), abrogated on other grounds by Neder v. United States, 527 U.S. 1 (1999).

Further, Heffernan found that despite Portsmouth stating that "'a requirement that coconspirators agree to reciprocate by submitting complementary bids on future projects' is not part of the definition of bid rigging," its statement of law was "inapt" because "the case was in fact a standard bid rotation case." Heffernan, 43 F.3d at 1146 (quoting Portsmouth, 694 F.2d at 325) (citing Portsmouth, 694 F.2d at 316 & n.2). However, as noted in the text above, the Fourth Circuit after its decision in Portsmouth has continued to define bid rigging by the broader definition set forth therein. See Brinkley, 783 F.2d at 1161.

15

violative of 15 U.S.C. section 1." Id.  Admittedly, bid rotation was at issue in Portsmouth.  See

694 F.2d at 316 & n.2 ("[T]he conspirators would trade projects among themselves by agreeing to

withhold bids or to submit artificially high 'complementary' bids on certain projects.").  However,

the Fourth Circuit's opinion in Brinkley did not caveat its use of Portsmouth's definition with a

limitation to bid rotation cases, and that court found that "where two or more persons agree that

one will submit a bid for a project higher or lower than the others or that one will not submit a bid

at all, then there has been an unreasonable restraint of trade which violates the Sherman Antitrust

Act."  Brinkley, 783 F.2d at 1160-61 (describing this as "an accurate statement of the law").

Moreover, scholarly authorities' definition of bid rigging has not constrained the practice

to bid rotation alone.  For example, the Portsmouth court cited Rudolf Callman's The Law of

Unfair Competition, Trademarks and Monopolies approvingly for the proposition that "collusive

bidding is 'an agreement between competitors in a bidding contest to submit identical bids or, by

preselecting the lowest bidder, to abstain from all bona fide effort to obtain the contract." 694 F.2d

at 325 n.18  (emphasis added) (quoting 1. Rudolf Callmann, The Law of Unfair Competition,

Trademarks and Monopolies § 4.34, at 203 (4th ed. 1981)).  Julian von Kalinowski's Antitrust

Laws and Trade Regulation explains similarly:

> Bidding practices that are judged as per se price fixing include: comparing bids
> prior to submission, agreeing to fix their bids so that one of them will receive the
> bid at a non-competitive price, agreeing to make identical bids or bids higher than
> another submitted bid, agreements to refrain from bidding competitively or against
> one another, agreeing to utilize a common estimator for calculating and submitting
> bids, and sham or fraudulent bids to create the illusion of competition.

1 Julian O. von Kalinowski, Antitrust Laws and Trade Regulation § 13.02 (2d ed.), LexisNexis

(database updated Dec. 2020) (emphasis added) (footnotes omitted).

As a final example, the United States Sentencing Guidelines indicate that bid rigging and

bid rotation are always understood to be synonymous.  Within the general "Bid-Rigging, Price-

Fixing or Market-Allocation Agreements Among Competitors" section, the guidelines contain a one-level upward enhancement in offense level "[i]f the conduct involved participation in an agreement to submit noncompetitive bids" as well as a separate special instruction for fines regarding "a bid-rigging case in which the organization submitted one or more complementary bids." U.S.S.G. § 2R1.1(b)(1), (d)(3); see also Heffernan, 43 F.3d at 1146 (explaining that bid-rotation is also sometimes referred to as the submission of "complementary bids"). The distinction in verbiage implies, in the eyes of the Sentencing Commission at least, that bid rigging is not always bid rotation. See also Heffernan, 43 F.3d at 1146 ("Another provision of the guideline, moreover, refers to 'a bid-rigging case in which the organization submitted one or more complementary bids,' implying that some bid rigging does not or at least need not involve bid rotation." (quoting U.S.S.G. § 2R1.1(d)(3))). Further, the Fourth Circuit has found that the sentence's offense level enhancement for situations where "the conduct involved participation in an agreement to submit non-competitive bids," "is [not] limited to bid-rotation cases." United States v. Romer, 148 F.3d 359, 371 (4th Cir. 1998), abrogated on other grounds by Neder v. United States, 527 U.S. 1 (1999).

Defendant Contech's argument that the fact that this case does not involve bid rotation or "complementary bids" means that it is beyond the purview of bid rigging condemned by the Fourth Circuit is at tension with the plain language of Portsmouth and Brinkley and the reasoning set forth in the non-binding authority above. Here, the indictment alleges defendant Brewbaker solicited and received Company A's upcoming bid prices and crafted a bid for defendant Contech that was intended to lose because it was intentionally higher than Company A's bid, and defendants admit defendant Contech's bid was designed to always be higher than its distributor's. (See Indictment (DE 1) ¶¶ 2, 14; Def. Contech's Memo. Supp. Mot. (DE 36) 23). This is analogous to the situation

17

in Brinkley in which co-conspirators "contacted [defendant] requesting a safe number to bid and [defendant] consented to give them one." 783 F.2d at 1160. The Fourth Circuit stated that "[a]t that point, there was an agreement between two competitors pursuant to which bids would be submitted" and that "such an agreement is clearly bid rigging." Id. at 1160.

In sum, the conduct alleged in the indictment falls squarely within the Fourth Circuit's definition of bid rigging, if the relevant bidding agreement was entered into by two or more entities competing for that bid, and, as discussed below, Company A and defendant Contech would have been exactly that but for their alleged agreement not to compete.

> 2.      Whether the Underlying Arrangement was Vertical or Horizontal in Nature

Defendants argue that their scheme fails the definition of bid rigging condemned as per unreasonable because defendant Contech and Company A were not competitors and, rather, were engaged in a vertical manufacturer-distributor relationship, and that their alleged agreement, if anything, acted as vertical price fixing. However, the court cannot accept this argument as it ignores the fact that, in their roles as separate bidders for NCDOT projects, defendant Contech and Company A facially competed for award of the projects. Because of that fact, their arrangement to not compete in this process necessarily was horizontal in nature.

Defendants primarily rely on the Supreme Court's analysis in Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877 (2007), which the defendants repeatedly imply signaled a pivotal change in antitrust law, as well as relying on the Fifth Circuit's analysis on remand. See, e.g., (Defendant Contech's Reply (DE 53) 10 ("We would have a different case . . . if we lived in a pre-Leegin antitrust world arid of the modern teaching of economics.")). Defendants describe precedent in terms of post- and pre-Leegin, seemingly insinuating that antitrust cases decided before Leegin are limited in the wake of the decision, which defendant Contech describes as

holding that "manufacturer-dealer price coordination is, indeed, inherently governed by the rule of reason." (Def. Contech's Memo. Supp. Mot. (DE 36) 7; see Def. Brewbaker's Resp. (DE 49) 4 n.1).

In Leegin, the Supreme Court reversed course on its prior holding that "a vertical agreement between a manufacturer and its distributor to set minimum resale prices"[5] is per se illegal, relying on its jurisprudential trend of "continu[ing] to temper, limit, or overrule once strict prohibitions on vertical restraints." 551 U.S. at 887, 901. The economic arrangement in Leegin involved a manufacturer's policy of requiring retailers to follow its suggested retail prices, which the Court, and both parties, characterized as vertical since the manufacturer and the retailers did not act competitors. Id. at 883-84, 907-08.

The Fifth Circuit, on remand, considered the argument of PSKS (the plaintiff in Leegin) that "because Leegin is a dual distributor, operating as both a manufacturer and retailer of Brighton goods, the [resale price maintenance] policy is a horizontal restraint." PSKS, Inc. v. Leegin Creative Leather Prod., Inc. (Leegin II), 615 F.3d 412, 420 (5th Cir. 2010). The Fifth Circuit rejected this argument, noting that "eight other circuits have applied the traditional rule of reason to dual distribution systems" and that economic logic dictated treatment of the agreement as still vertical. Id. 421 & n.8 (collecting cases).

However, the Fourth Circuit, in the two cases it has discussed Leegin, has not described it as marking any general shift in antitrust law or altering the general analysis of vertical or horizontal trade practices. See TFWS, Inc. v. Franchot, 572 F.3d 186, 192 & n.9 (4th Cir. 2009) (explaining that the relevant arrangement was "a form of horizontal price fixing" and that "Leegin, in contrast,

---

[5] "[R]esale price maintenance is the practice by which a manufacturer and a distributor agree on a minimum price below which the distributor will not sell the manufacturer's products." Valuepest.com of Charlotte, Inc. v. Bayer Corp., 561 F.3d 282, 286 (4th Cir. 2009).

Case 5:20-cr-00481-FL   Document 79   Filed 03/16/21   Page 19 of 24

concerned vertical resale price maintenance, holding that such arrangements were no longer subject to the per se rule," meaning that its "holding is inapposite" and "[i]n fact, Leegin, far from undermining [the court's] conclusion that horizontal price fixing is per se illegal under the Sherman Act, actually reiterates that rule"); Valuepest.com of Charlotte, Inc. v. Bayer Corp., 561 F.3d 282, 286-87 (4th Cir. 2009) (rejecting plaintiff's argument that the Supreme Court had implicitly overruled its precedent holding "a principal-agent relationship is not an agreement for antitrust purposes" through its holding in Leegin).

Instead, Leegin's relevance here is limited to the uncontroversial proposition that vertical restraints are typically viewed under the rule of reason and that "[r]esort to per se rules is confined to restraints . . . 'that would always or almost always tend to restrict competition and decrease output.'" See Leegin, 551 U.S. at 886 (quoting Business Electronics, 485 U.S. at 723). The Leegin Court's specific overturning of precedent "establishing a per se rule against a vertical agreement between a manufacturer and its distributor to set minimum resale prices" is inapposite to the instant case. Id. at 887. "[R]esale price maintenance . . . [,] the practice by which a manufacturer and a distributor agree on a minimum price below which the distributor will not sell the manufacturer's products," Valuepest.com, 561 F.3d at 286, is not at issue in this case. The Leegin Court's treatment of the arrangement in Leegin as vertical was undiscussed and premised in part on the defendant's specific, uncontested, contention that the arrangement between it and its distributor that controlled the prices at which the distributor could sell the defendant's product was vertical. See Leegin, 551 U.S. at 884 ("Leegin did not dispute that it had entered into vertical price-fixing agreements with its retailers."). The Leegin Court's discussion of when per se illegality is appropriate is not an invitation for federal district courts to reexamine the economic effects of practices that binding circuit precedent defines as per se illegal, like bid rigging.

20

Defendants further argue that the instant case is analogous to the arrangement discussed by the district court and the Fifth Circuit on remand from <u>Leegin</u>, 551 U.S. 877. On remand, the district court addressed the plaintiff's argument that because the defendant-manufacturer was also a distributor and retailer of the relevant product, its resale price maintenance agreement with its retailer/distributor should instead be viewed as a horizontal agreement between competitors. <u>See</u> <u>Leegin II</u>, No. CV 2:03CV107(TJW), 2009 WL 938561, at *2 (E.D. Tex. Apr. 6, 2009), <u>aff'd</u>, 615 F.3d 412 (5th Cir. 2010). The district court explained that "[w]here a manufacturer is both a wholesale distributor and retail distributor it is called a 'dual distribution system.'" <u>Id.</u> at *6. It further explained that it rejected plaintiff's horizontal argument, which plaintiff did not raise at trial, because binding Fifth Circuit precedent and multiple other circuits had "held that in situations like Leegin's, where the manufacturer also distributes some of its own goods, restraints are properly analyzed under the rule of reason," <u>id.</u>, a conclusion which the Fifth Circuit affirmed, explaining that the economic reality of the situation was that "[i]f Leegin sought only to raise its margins, it would raise the price of [the price-controlled] goods at the wholesale level, where it could capture all the gains. Leegin is thus no different from a manufacturer that does not have retail stores." <u>Leegin II</u>, 615 F.3d at 421 & n.8.

The Fourth Circuit has not explicitly ruled in a published opinion on whether dual distribution systems are inherently vertical or horizontal and instead has suggested any arrangement's orientation should be examined on a case-by-case basis. <u>See Donald B. Rice Tire Co. v. Michelin Tire Corp.</u>, 638 F.2d 15, 16 (4th Cir. 1981) (per curiam) (rejecting the "implication . . . that a restraint may always be regarded as vertical if it is imposed by the manufacturer" and instead instructing courts to "distinguish between a conspiracy . . . that would benefit the dealers and one involving the same parties but redounding primarily to the benefit of the manufacturer"

with the former being "horizontal in nature and per se illegal" and "latter would be vertical and analyzed under the rule of reason").

Even presuming the instant arrangement resembles dual distribution systems examined in Leegin II and similar cases, inquiry beyond the label "dual distribution"[6] is needed to ascertain the nature of the conspirators' arrangement in the context of the agreed-upon restraint. As the Second Circuit has stated, although the distinction between vertical and horizontal agreements under antitrust law "is sharp in theory, determining the orientation of an agreement can be difficult as a matter of fact and turns on more than simply identifying whether the participants are at the same level of the market structure." United States v. Apple, Inc., 791 F.3d 290, 314 (2d Cir. 2015); GTE Sylvania, 433 U.S. at 58 n.28 ("There may be occasional problems in differentiating vertical restrictions from horizontal restrictions originating in agreements among the retailers.").

The Second Circuit's analysis of the verticality issue in United States v. Apple, Inc., 791 F.3d 290 (2d Cir. 2015), is informative. The Second Circuit held that "where the vertical organizer has not only committed to vertical agreements, but has also agreed to participate in the horizontal conspiracy . . . , the court need not consider whether the vertical agreements restrained trade because all participants agreed to the horizontal restraint, which is 'and ought to be, per se unlawful.'" See id. at 325 (quoting Leegin, 551 U.S. at 893). It further explained that it would look to "the relevant 'agreement in restraint of trade,'" which in that case was "the price-fixing

---

[6] The court finds convincing that dual-distribution systems typically refer to distribution of the same product whereas here defendant Contech sells aluminum products to a distributor and then submits intentionally losing bids on aluminum product installation projects. Compare, e.g., Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc., 129 F.3d 240, 243 (2d Cir. 1997) (explaining that "where, as here, the manufacturer distributes its products through a distributor and independently[,] . . . [this is a] so-called "dual distribution" arrangement[]" and that "the dispute involves one manufacturer's product"), with Koppers 652 F.2d 292 (rejecting that because one conspirator "was buying all of its road tar" from the other conspirator at one point during the conspiracy, the agreement between the two to rig bids in state lets for "sale and application of road tar" was not a horizontal bid rigging agreement). Here, the actual "product" defendant Contech is alleged to offer as a manufacturer and as a bidder differ: as a manufacturer, defendant Contech provides aluminum pieces to Company A; as a bidder on NCDOT projects, defendant Contech provides installation and completion of aluminum structures. (See Indictment (DE 1) ¶¶ 7-8).

conspiracy identified by the district court," "an agreement between [defendant] Apple and the Publisher Defendants to raise consumer-facing ebook prices," "not [defendant] Apple's vertical contracts with the Publisher Defendants." Id. at 325 (emphasis added); see also United States v. Usher, No. 17 CR. 19(RMB), 2018 WL 2424555, at *3 (S.D.N.Y. May 4, 2018) ("[T]he question of what one defendant is doing with another defendant at some random snapshot in time is not the relevant question in a Section 1 Sherman Act case. The relevant question is whether the nature of the restraint, the nature of the collusion that the defendants agreed to is horizontal." (quotations omitted)).

Looking to the relevant agreement, it restrained horizontal business activity: submitting bids. Defendant Contech admits that "the indictment essentially charges that the manufacturer," defendant Contech, "submitted an additional direct bid" after conferring with its dealer on what price the dealer would be using in its bid. (Def. Contech's Memo. Supp. Mot. (DE 36) 3-4) (emphasis added); see also id. at 10 (describing the indictment as "attack[ing] a manufacturer who sells through a dealer and who also submits its own direct offering price that the dealer expects will not undercut the dealer's price"). Although there are aspects of defendant Contech and Company A's relationship that are vertical (e.g., Contech's selling aluminum pieces to Company A to use), the restraint at issue was horizontal because the two presented themselves as potential competitors for the bidding process for NCDOT projects. (See Def. Brewbaker's Resp. (DE 49) 2 (describing "bidders for a construction project" as a "'horizontal' relationship"); United States v. Reicher, 983 F.2d 168, 170 (10th Cir. 1992) ("The decisive circumstance in defining 'competitors' is the simple fact that [defendant] submitted a bid for the . . . contract. Despite its ultimate inability to perform the contract, [defendant] held itself out as a competitor for the purposes of rigging what was supposed to be a competitive bidding process."). Any vertical relationship, here, only

Case 5:20-cr-00481-FL   Document 79   Filed 03/16/21   Page 23 of 24

intersected with and gave rise to the horizontal arrangement at issue, the actual bid-rigging agreement. Cf. Koppers, 652 F.2d at 296-97 (holding that the vertical component of the co-conspirators' relationship only furthered the objective of the horizontal conspiracy "to raise prices and deceive state and local officials into the belief that [the co-conspirators] were bona fide competitors [in bidding] when in fact . . . they were not"); Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Assoc. of Bridge, Structural, Ornamental, and Reinforcing Iron Workers, 815 F.3d 43, 64 (1st Cir. 2016) (explaining that "[i]n order to potentially generate per se antitrust liability, [defendant's] vertical relationships would at least need to intersect with or give rise to an unlawful horizontal relationship" and finding such had not been shown). The alleged agreement restrained how the two companies would compete against one another in the bidding process, a horizontal arrangement, despite the fact that the agreement had the vertical benefit for defendant Contech of maintaining its relationship with its dealer.

In sum, the indictment alleges what the Fourth Circuit defines as bid rigging, and it alleges the arrangement was horizontal in nature. Accordingly, under Portsmouth, the rule of reason does not apply under the circumstances of this case.

## CONCLUSION

Based on the foregoing, the instant motion (DE 35) is DENIED.

SO ORDERED, this the 16th day of March, 2021.


LOUISE W. FLANAGAN
United States District Judge