IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CR-481-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | MEMORANDUM OPINION |
| BRENT BREWBAKER, ) | |
| ) | |
| Defendant. ) | |

This matter came before the court for sentencing on September 8, 2022. The court memorializes herein certain decisions made at sentencing hearing, in address of objections lodged by defendant to the Presentence Investigation Report ("PSR"), regarding calculation of defendant's advisory guidelines range and amount of restitution and fine.

## BACKGROUND

Indictment returned October 21, 2020, charged defendant with one count of conspiracy to rig bids in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("count one"), one count of conspiracy to commit mail and wire fraud ("count two"), three counts of mail fraud ("counts three through five"), and one count of wire fraud ("count six"). After trial commencing January 24, 2022, defendant was found guilty by the jury on all six counts on February 1, 2022.[1]

Prior to sentencing, the United States Probation Office prepared the PSR, which calculated defendant's criminal history level as a I and his total offense level as a 26, which yields an advisory guideline sentencing range of 63 to 78 months imprisonment. Pertinent here, the probation office

---

1 The court's memorandum opinion assumes familiarity with the underlying facts of this complex, long-running case.

calculated defendant's total offense level by beginning with a base offense level of seven, determined pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(b). Under the probation office's calculation, defendant received a 16-level offense enhancement under § 2B1.1(b)(1)(I) for being accountable for a loss between $1,500,00.00 and $3,500,000.00 and a three-level offense adjustment under § 3B1.1(b) as a manager or supervisor of criminal activity involving five or more participants. The probation office did not recommend that defendant receive a two-level reduction under § 3E1.1(a) for acceptance of responsibility.

At sentencing, the court sustained a number of defendant's objections to the PSR, which are reflected on the record in full, but of special pertinence here are the court's rulings on defendant's objections to the loss amount at issue; the value of goods provided by former defendant, and former employer of defendant, Contech Engineered Solutions LLC ("Contech"),[2] to coconspirator Pomona Pipe Products ("Pomona"); the section of Chapter Two of the guidelines controlling defendant's offense level; the amount of restitution; and amount of the fine to be imposed. After the court's various rulings detailed herein,[3] the court calculated an offense level of 20, which, when combined with defendant's undisputed criminal history category of I, advised a sentence between 33 to 41 months. The court imposed a variant sentence of 18 months and a fine of $111,000.00.

---

[2] Pursuant to written plea agreement, Contech pleaded guilty May 11, 2021, to the same criminal violation of the Sherman Act and conspiracy to commit mail and wire fraud with which defendant was charged. On June 7, 2021, the court imposed a sentence on Contech requiring it to pay $7,000,000.00 fine, and to pay $1,533,988.00 in restitution to the North Carolina Department of Transportation.

[3] Where minimal argument was made as to the propriety of the two Chapter 3 adjustments at issue (§§ 3B1.1(b), 3E1.1(a)), the court does not herein explicate its reasoning regarding these adjustments and, instead, makes reference to the analysis provided at sentencing as captured by the record. In addition, defendant made a number of other objections to factual matter within the PSR, which did not find favor with the court and do not merit further mention here. See United States v. Love, 134 F.3d 595, 606 (4th Cir. 1998) ("Without an affirmative showing the information is inaccurate, the court is free to adopt the findings of the [presentence report] without more specific inquiry or explanation.").

# COURT'S DISCUSSION

A.  Cost of Aluminum Purchased by Pomona from Contech

As is relevant to a number of defendant's objections to the PSR's calculated guideline range, adopted and advocated for by the government, the court considered the value of the aluminum sold to Pomona by Contech related to the bids to the North Carolina Department of Transportation ("NCDOT"), underlying the bid-rigging conspiracy, won by Pomona.

Where "[a]t sentencing" there remains "any dispute" as to a "portion of the presentence report," the court "must . . . rule on the dispute." Fed. R. Crim. P. 32(i)(3)(B). The court, at sentencing, may rely on "any relevant information before it . . . provided that the information has sufficient indicia of reliability to support its accuracy." United States v. Cox, 744 F.3d 305, 308 (4th Cir. 2014); see also United States v. Slager, 912 F.3d 224, 233 (4th Cir. 2019) ("When sentencing courts engage in fact finding, preponderance of the evidence is the appropriate standard of proof.").[4] Although defendants have an "affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate," United States v. Terry, 916 F.2d 157, 162 (4th Cir. 1990), ultimately, "[t]he burden is on the [g]overnment to prove the facts needed to support a sentencing enhancement by a preponderance of the evidence." United States v. McManus, 734 F.3d 315, 319 (4th Cir. 2013); see also United States v. Catone, 769 F.3d 866, 876 (4th Cir. 2014) (explaining the burden of proof is on the government "prove the amount of loss by a preponderance of evidence"); United States v. Steele, 897 F.3d 606, 613 (4th Cir. 2018) (explaining the government bears the "burden to offer evidence supporting its restitution calculation," dispute over which is to "be resolved by the court by the preponderance of the evidence").

---

4   Internal citations and quotation marks are omitted from all citations unless otherwise specified.

Here, the PSR relied upon the trial testimony of Donald Joyce, Jr., ("Joyce"), chief executive officer of Pomona, during which he estimated that the price of Contech's aluminum constituted 75% to 80% of Pomona's bid price on aluminum structure projects, as submitted to NCDOT. (PSR (DE 252) ¶ 20). From that estimate, the PSR calculated that of the $25,313,730.64[5] paid to Pomona by NCDOT for contracts won as part of the bid-rigging conspiracy, a conservative 70% was paid to Contech: "$17,719,611.45." (Id.). The PSR also relied on this 70% estimate to calculate defendant's restitution owed NCDOT. (Id. ¶ 26).

Defendant contends Joyce's 75% to 80% estimate is inaccurate and unreliable and, thus, the PSR's contingent 70% estimate and $17,719,611.45 calculation of Contech's relevant proceeds are inaccurate. To support this contention, defendant points to his analysis of Contech's invoices from the relevant period, which he asserts show that Contech's revenue related to the pertinent bids was $11,105,211.30. (Def.'s Table (DE 255-5) at 2-8). Although the government averred at sentencing that 31 bids were missing from defendant's calculation, it did not provide what Contech's revenue from those bids was or from the July 2018 and August 2018 bids not introduced at trial. Moreover, it conceded that it did not have any reason to believe that defendant's calculations were inaccurate.

Thus, the court concluded that the government had failed to show by a preponderance of evidence that Joyce's estimate as to Contech's revenue was accurate and reliable. Defendant's objection to the PSR regarding its factual recitation of Contech's revenue related to scheme, accordingly, was sustained, and the court utilized defendant's proffered $11,105,211.30 calculation.

---

[5] It is undisputed that evidence presented at trial only concerned bids between August 2009 and June 2018, the dates identified in count one of the indictment, which totaled $23,980,593.87.

4

B.  Offense Level Calculation

Defendant next objected to the PSR's use of § 2B1.1 to calculate his offense level as opposed to § 2R1.1.

When a defendant is convicted of multiple counts, § 3D1.1 guides that the court should "[g]roup the counts resulting in conviction into distinct [g]roups . . . by applying the rules specified in § 3D1.2" and then "[d]etermine the offense level applicable to each [g]roup by applying the rules specified in § 3D1.3." U.S.S.G. § 3D1.1(a). Section 3D1.2 requires that "counts involving substantially the same harm . . . be grouped together," with the explanation that "[c]ounts involve substantially the same harm . . . [w]hen counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Id. § 3D1.2(b). When counts are grouped according to § 3D1.2(b), "the offense level applicable to [the] [g]roup is . . . the highest offense level of the counts in the [g]roup" after applicable enhancements and adjustments under Chapters 2 and 3. U.S.S.G. § 3D1.3(a).

The court turned to the potentially applicable sections of the guidelines: § 2R1.1 for count one, § 2X1.1 for count two, which incorporates § 2B1.1 in this instance, and § 2B1.1 for counts three through six. However, § 2B1.1(c)(3) explains that if 1) certain limitations on the subsection's applicability are not implicated, 2) "the defendant was convicted under a statute proscribing . . . fraudulent statements or representations generally (e.g., 18 U.S.C. . . . § 1341 . . . § 1343); and [3)] the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline . . . , apply that other guideline." U.S.S.G. § 2B1.1(c)(3); see also id. § 1B1.2 (requiring the sentencing court to "[d]etermine the offense guideline section . . . applicable to the offense of conviction (i.e., the offense conduct charged in the count of the indictment . . . of which the defendant was convicted)"). The commentary further explains that "the count of conviction"

5

must "establish[] an offense involving fraudulent conduct that is more aptly covered by another guideline." Id. § 2B1.1 cmt. n.17.

For example, the United States Court of Appeals for the Fourth Circuit considered the applicability of § 2B1.1(c)(3) in United States v. Poole, 451 F. App'x 298 (4th Cir. 2011). It concluded that where defendant's "convictions for mail and wire fraud required the government to prove beyond a reasonable doubt that he 'feloniously and intentionally killed'" his victims, the conduct set forth in those counts of conviction established an offense specifically covered by another guideline, § 2A1.1(a), the guideline pertaining to first-degree murder. Id. at 308. Similarly, in United States v. Bryant, 93 F. App'x 573 (4th Cir. 2004), the court found the cross-reference appropriate where the relevant counts and "the introduction of the indictment . . . . all reference[d] [defendant's] involvement with firearm offenses," meaning his "conduct, as set forth in the count of conviction, established a firearm offense specifically covered in . . . § 2K2.1." Id. at 575.

Other circuits have considered more analogous factual scenarios. In United States v. Rubin, 999 F.2d 194 (7th Cir. 1993), the court, interpreting § 2F1.1 and its commentary, which formerly covered fraud offenses,[6] concluded the district court erred by not applying § 2R1.1, although that defendant was convicted under 18 U.S.C. § 1341, which the guidelines indicated should be controlled typically by § 2F1.1. Id. at 197. The court explained that "[e]ven though the

---

6     Section 2F1.1 was removed as a separate section of guidelines in 2001 and consolidated with § 2B1.1. United States v. Miller, 316 F.3d 495, 503 & n.4 (4th Cir. 2003); United States v. Johnson, 387 F. App'x 402, 404 n.* (4th Cir. 2010). As pertinent here, the commentary to that former section read, "[w]here the indictment . . . setting forth the count of conviction . . . establishes an offense more aptly covered by another guideline, apply that guideline rather than § 2F1.1," based on the acknowledgement that "[s]ometimes, offenses involving fraudulent statements are prosecuted under . . . [a] general [fraud] statute, although the offense involves fraudulent conduct that is also covered by a more specific statute." U.S.S.G. § 2F1.1 cmt. n.14 (2000) (repealed 2001). This language is akin to the current language in application note 17 of § 2B1.1's commentary, see, e.g., United States v. Wang, 944 F.3d 1081, 1088 (9th Cir. 2019) (describing the two application notes as "materially identical"), and has been described as having "operated like a cross reference," U.S.S.G. § 2F1.1 app. C, amend. 617 (Nov. 2002), which is now the official terminology used to refer to § 2B1.1(c)(3)'s operation.

defendants . . . were convicted[] of mail fraud . . . , the defendants' fraud . . . was designed to conceal and further their price-fixing scheme," the type of conduct covered specifically by § 2R1.1. Id.

In contrary example, although not applying § 2F1.1's commentary, the court in United States v. Anderson, 326 F.3d 1319 (11th Cir. 2003), affirmed a district court's application of § 2F1.1 over § 2R1.1, although defendant was sentenced for convictions under the Sherman Act and 18 U.S.C. § 371 (conspiracy). Id. at 1331-32. It explained that while "there [was] no question [defendant] engaged in bid-rigging," his "conviction . . . assume[d] [he] committed fraud" and that "[b]id-rigging was merely a means to an end," where "the purpose of [defendant's] bid rigging was to commit fraud." Id. at 1332. It contrasted the factual scenario before it with Rubin in which the purpose of the fraud was to conceal the bid-rigging. See id. The United States Court of Appeals for the Eleventh Circuit has found Anderson's analysis sufficiently analogous for application under what is now § 2B1.1's application note 17. See United States v. Baldwin, 774 F.3d 711, 733 (11th Cir. 2014).

Here, cross-reference to § 2R1.1 is appropriate as the conduct set forth in counts two through six, for which defendant was convicted, establishes offenses specifically covered by § 2R1.1 because the conduct charged in those counts is more aptly covered by § 2R1.1's bid-rigging principles. The introduction of the indictment and counts two through six all focus on and reference the bidding activity and the fraud conducted to realize the actual rigging of those bids. (Indictment (DE 1) ¶¶ 27-40); see also Bryant, 93 F. App'x at 575. Like Rubin, defendant's fraud, submitting bids that falsely claimed to be non-collusive and competitive, was designed to conceal and further the bid-rigging conspiracy. Here, fraud was a means to an end: concealing the bid-

7

rigging. Thus, although defendant's offenses involved fraudulent conduct, that described conduct is more aptly covered by § 2R1.1.

Where all the counts, on the above analysis, are controlled § 2R1.1, inquiry under § 3D1.3 was unnecessary, and the court turned to determination of defendant's offense level under § 2R1.1. Defendant starts with a base offense level of 12, which is enhanced by four points because the "volume of commerce done by him or his principal in goods or services" was between $10,000,000.00 and $50,000,000.00, accepting defendant's calculation for the reasons noted above. U.S.S.G. § 2R1.1(b)(2)(B). Next, because defendant's "conduct involved participation in an agreement to submit noncompetitive bids," for all the reasons previously announced by the court, (see, e.g., Feb. 8, 2022, Mem. Op. (DE 228) at 2-5; Mar. 16, 2021, Order (DE 79) at 10-18), defendant's offense level increases by another point, for a total of 17, after all applicable Chapter Two enhancements.[7]

For reasons sufficiently evident on the record at the September 8 proceeding, in considering Chapter Three adjustments, the court increased defendant's offense level by three under § 3B1.1(b) due to defendant's managerial role and declined to decrease defendant's offense level for acceptance of responsibility pursuant to § 3E1.1. Defendant's total offense level, thus, was 20, which, when combined with his criminal history category for I, advised a sentence of imprisonment for 33 to 41 months. In the above manner, defendant's objection to the PSR's calculation of his offense level was sustained.

---

[7] Defendant's renewed objection as to the label noncompetitive bids in so far as it relies on United States v. Heffernan, 43 F.3d 1144 (7th Cir. 1994), fails for the reasons previously identified by the court, namely, the Fourth Circuit's opinion in United States v. Romer, 148 F.3d 359 (4th Cir. 1998). (Mar. 16, 2021, Order (DE 79) at 15 & n.4).

8

C. Remaining Aspects of Defendant's Sentence

As already noted, the court, ultimately, sentenced defendant to 18 months imprisonment, on defendant's motion for downward variance.[8] The reasons for that variant sentence of imprisonment are adequately captured on the record. However, the court, here, further explains reason for not ordering defendant pay restitution and for imposing fine of $111,000.00.

1. Fine Amount

Section 5E1.2 guides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a); 18 U.S.C. § 3571(a) ("A defendant who has been found guilty of an offense may be sentenced to pay a fine."). Typically, the guidelines provide a suggested range of fines based on the defendant's offense level, but "[i]f . . . the guideline for the offense in Chapter Two provides a specific rule for imposing a fine, that rule takes precedence." U.S.S.G. § 5E1.2(b). Section 2R1.1 provides specifically that "[f]or an individual, the guideline fine range shall be from one to five percent of the volume of commerce but not less than $20,000.00." U.S.S.G. § 2R1.1(c); see also 15 U.S.C. § 1 (allowing maximum fine of $1,000,000.00); 18 U.S.C. § 3751(b)(3) (allowing maximum fine of $250,000). Where the instant volume of commerce was approximately $11,100,000.00, the court considered fine between $111,000.00 and $555,000.00, concluding that $111,000.00 was appropriate in the instant circumstances.

2. Restitution Amount

The Mandatory Victims Restitution Act ("MVRA") requires for certain offenses, including those for which defendant has been convicted, that "the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). This amount, "in the case of an offense resulting in . . .

---

[8] The court declined to depart downwards under § 5H.16 as advocated by defendant.

loss . . . of property of a victim of the offense," should be "the greater of . . . the value of the property on the date of the . . . loss . . . ; or . . . the value of the property on the date of sentencing." Id. § 3663A(b)(1); see also id. § 3663(a)(1)(B)(i) (explaining that when restitution is permissive, the court should consider "the amount of the loss sustained by each victim"). "Because the MVRA focuses on the offense of conviction rather than on relevant conduct, the focus of [a sentencing] court in applying the MVRA must be on the losses to the victim caused by the offense." United States v. Llamas, 599 F.3d 381, 390 (4th Cir. 2010).

"[T]he MVRA does not require absolute precision so long as there is a basis for reasonable approximation." United States v. Manlapaz, 825 F. App'x 109, 118 (4th Cir. 2020). However, the MVRA does not permit the court to "allow[] the victim to obtain a 'windfall'" by ordering more restitution than necessary "to ensure that [the] victim[] [is] made whole." Steele, 897 F.3d at 611. Thus, courts are permitted to order restitution with considerations of "joint and several liability" in mind. See, e.g., United States v. Dillard, 641 F. App'x 252, 254 (4th Cir. 2016); see also 18 U.S.C. § 3664(h); United States v. Newsome, 322 F.3d 328, 341 (4th Cir. 2003) ("[The court] may apportion the payment among defendants if more than one defendant has contributed to the loss.").

Here, accepting the government's calculation method for restitution, no restitution from defendant Brewbaker is due NCDOT, in light of the court's conclusion as to revenue generated for Contech by Pomona's winning bids. The government and the PSR rely on the following restitution calculus: the total value of Pomona contracts at issue multiplied by the 70% estimate of cost of Contech aluminum constituting that value (which the government describes together as Contech's volume of commerce) and multiplied, again, by 10%, based on § 2R1.1 application note three's

10

guidance on the assumed gain in price fixing cases.[9] For the reasons previously noted, the 70% estimate is an inaccurate one. Thus, correcting the numbers plugged into the government's formula by using the adopted volume of Contech's commerce described above, the restitution amount would be $1,110,521.13.

The government concedes that the amount of restitution defendant should owe NCDOT should be reduced by the amount Contech has already paid NCDOT. There is no indication by either party or probation that Contech did not pay restitution of $1,533,988.00 to NCDOT as ordered. (Judgment (DE 115) at 2, 4).[10] Where that amount is above what restitution would be owed by defendant under theory of the government, which carries burden of proof as to the amount of restitution, the court did not order any restitution be made by defendant as would cause a windfall for NCDOT. See Steele, 897 F.3d at 611; (see also Contech's Sent'g Mem. (DE 119) at 4 (revealing that NCDOT represented that the restitution paid by Contech would fully compensate it)).

## CONCLUSION

For the foregoing reasons, the court OVERRULED IN PART and SUSTAINED IN PART defendant's objections to the PSR as set forth herein.

DATED, this the 15th day of September, 2022.

_____
LOUISE W. FLANAGAN
United States District Judge

---

[9] Application note three explains, in reference to setting a fine for an organization, "[it] is estimated that the average gain from price-fixing is 10 percent of the selling price." U.S.S.G. § 2R1.1 cmt. n.3.

[10] A defendant may stipulate by plea agreement to restitution in amount above what would be required by the MVRA alone. See United States v. Squirrel, 588 F.3d 207, 217 (4th Cir. 2009).